Good morning, members of the Court. My name is George Washington, and it is my very distinct honor to represent the Coalition and the Black and Latino students who have brought this case before you today. Mr. Washington, excuse me, we want to stay true to the stipulation, so would you, Ms. Funk, put the time on the clock? I believe Mr. Washington is going to take how much? Ten minutes. Ten minutes for Mr. Washington. Thank you. I'm sorry, sir. There you go. Okay. Thank you very much. I want to focus today my remarks, of course, on the questions from the Court, but above all on the Wilson case and its effect on your jurisdiction and your decision. But before I do that, I want to make two fundamental points about this case. And the first fundamental point is this. If you look at our complaint, and in particular the charts, which are on pages 75 through 79 of the excerpts of record, what you see there is a profound demographic fact about California and really about the nation. We are going through the most profound demographic change we have gone through in at least a century. Half of all of the graduates of public high schools in California are now Latino, black, or Native American, and that number is going up. And then the other profound demographic fact, which is shown in those charts, and shown imperfectly, I might add, is that because of Proposition 209, the number of black, Latino, and Native American students who can be admitted to the UC as a whole, for black and Native American, it's fallen absolutely. For Latina, it has not kept pace with the rise in population. And if we had the charts for the law schools and the medical schools and so forth, you would see even more dramatic results. And we would say, if you look at those charts, what you see before you is the creation of a new form of separate and unequal going on right before our eyes. And for 14 years, the University of California has tried to mitigate the effects of Proposition 209. They have not done everything we think they should have done, but they have done many things, and it hasn't helped. It hasn't stopped. And the question is, is that law as it has been applied for 14 years to higher education constitutional? Does it comply with the 14th Amendment? And we make two fundamental arguments, and then I want to talk about the Wilson case. The first argument we make is that what that law does is, just as during the time of slavery and during segregation, it makes it unlawful to adopt the only type of law, the only type of admission program, which would allow black and Latino students to go to the universities and the graduate schools and the medical schools, which is affirmative action. What that law has done is taken from the parents and the students the political right to seek the adoption by the regents of the only program that will work. The second argument we make, which is sometimes, I think, misnomed, the conventional equal protection clause argument, is this. This law is a new form of a black code. And by that I mean this. It is a special law, directed special restrictions on the admission of black and Latino and Native American students only. Only for those persons is it illegal to depart from the grade and test score standards. Only for those persons can somebody bring a lawsuit in court and say to the admissions policy, you're admitting too many black and Latino or you're violating the law. Nobody else can bring in any such lawsuit. It is as if the courts, the State, did not even trust its own admissions official. Kennedy. Nobody else. For instance, would it be the same, for instance, if that kind of pattern repeated itself on a gender basis? I think it would be true. Yes, it would be. And Prop 209 would do that. I think the reality is that with the exception of a few fields, in science and engineering, that gender has been something which affirmative action has worked so well that it's now very heavy admission of women into the schools. But, yes, it would. It would impose that same limit on gender, same censor sitting outside the admissions office looking over the shoulder. And Judge Tsushima, I think on the question of the effect of Wilson, I know we certainly agree with the dissenters in Wilson. We think Wilson was wrongly decided. We agree with the Sixth Circuit panel decision. We agree with what we think the en banc decision will be. But we don't think you have to reach the validity of Wilson, as decided in 1997 here, because it's a question of how it's applied in higher education. And on that point, sir. May I just ask, the thrust of your argument about the as-applied contention seems to be that our colleagues in Wilson, too, were not confronted with and did not appreciate the fact that Proposition 209, by virtue of eliminating affirmative action, would reduce the number of admittees from these particular minorities. Yet it would seem almost obvious to them that if they're going to allow Proposition 209 to stand in Wilson, too, it necessarily must have that effect so that maybe we're not looking at a new question. Judge Graves, I think our argument is not that the effect is what it is. Our argument is what Wilson did not understand is the nature of those criteria in the area of higher education. SAT and grade point averages are not mentioned, nor is BACI. And the problem is if the standard you have, the standard itself incorporates discrimination, then the fight against that standard and its effects is a fight against discrimination. And I want to give an illustration, if I might. Isamar Camacho, who is one of the plaintiffs and is in the courtroom, graduated from Roosevelt High School in East Los Angeles. That's where I went to high school. Is that right? Well, they have two good graduates then. Top of her class. Top of her class. I wasn't at the top of my class. Top of her class. Every kind of extracurricular activity. Went to all the UC California programs to try and bolster her ability to get in. But the fact is she wasn't admitted to the University of California at Berkeley. Why? Because she didn't have the advanced placement classes because they weren't available in her school and because nobody from her school scores as well on those SAT tests as kids from Beverly Hills or any other school. And those are both race-related factors. The evidence shows that, and we can prove that. And anybody who says that Isamar Camacho is fighting for a preference is simply not being truthful. The fact is she's fighting to get in, fighting discrimination, the discrimination that confines her to a Roosevelt High School the way it is today and the conditions that are there. And she's fighting in the only possible way one can fight to do that. Mr. Washington, let me ask you a question. Suppose we were to find that Wilson controls here, what would you have us do? Well, first I'd hope you would not find that. But I think Wilson is clearly wrongly decided for all the reasons set forth in the Sixth Circuit panel opinion. What's the status of the Sixth Circuit case? It will be argued en banc on March 7th. But I would say that I think in this particular case, the application of Wilson in higher education, what we've got is a standard which incorporates discrimination. They didn't consider that. And you're not bound by facts not covered. Wait a minute. A little while ago you said, you know, they didn't understand it. And now you're saying they didn't consider it. Are you saying that the Wilson panel didn't consider the application of 209 to higher education at all? No, they didn't consider the question of the standards of SAT. They didn't consider the standards of adjusted grade point average. They assumed there was a fair and equal standard. There is not a fair and equal standard. They didn't consider that when you've got a situation like this where there is no ultimate, the only way to fight the discrimination that Isamar Camacho and thousands like her face, the only way to fight that is through affirmative action. And it's just like Seattle. Why aren't there other ways to fight that? Didn't the Supreme Court indicate that there are other ways to address this besides this kind of proposition? Justice O'Connor said that urged people to study the experience in California. And the reality is if you study that experience, there is none. The University of California, everything they've done, those numbers keep falling relative to the population, and nothing changes because those tests, which nobody has devised a different test, and nobody has figured out how to put AP classes in Roosevelt High School as it exists today. I understand that the UC system will admit students from any high school at a certain, reach a certain percentile. There is a 4 percent thing, but the point is that even that doesn't change it. It's pointed out in our brief that even that does not do it. Do what? Does not achieve the kind of admission level that even keeps pace with the population. And I see my time has run out, so I think I should probably stop here and let's go on from there. Thank you, Mr. Washington. Good morning. Good morning, Your Honors. May it please the Court, I'm Antoinette Cordero here on behalf of Governor Edmund G. Brown, Jr. Good morning, Ms. Cordero. Good morning. I want to start by addressing Proposition 209 in the context of UC admissions. We believe that Proposition 209 does not level the playing field. Rather, it violates the Equal Protection Clause by creating an unequal political structure because it allows the UC regents to consider nonracial diversity factors as admissions criteria, but denies them the power to consider race as a diversity factor. That is precisely the kind of unequal treatment that the Supreme Court in Hunter and Seattle condemned. In Hunter, just the ---- Well, I don't know the purpose of arguing that Wilson was wrongly decided. I mean, that's water under the bridge, right? Well, Your Honor, we agree with our counsel who just went before me that Wilson is not ñ should not be controlling here for all the reasons we said in our brief and as argued by counsel that it can be distinguished. However, if this Court feels that it cannot distinguish Wilson, you may call for hearing en banc in this matter so that the Wilson decision may be reconsidered. And there are compelling reasons, or at least good reasons, for doing so. First, the ñ Well, I think you should put that in your petition for re-hearing. Or petition for hearing, you know, en banc initially, but not in an argument before a three-judge panel. Well, Your Honor, going back to Proposition 209, I mean, I can argue that Wilson should be distinguished because it did not specifically, although in a very general sense it looked at Proposition 209 in a facial challenge, it did not specifically consider the application of Proposition 209 to higher education. It did not specifically consider whether a law that allows the UC regents to consider non-racial diversity factors such as veteran status or whether an applicant comes from an underrepresented geographic area or the choice of major. Proposition 209 would allow the UC regents to take all of that into consideration but denies them the power to consider race and gender and only race and gender as diversity factors. The Wilson decision did not specifically look at that and certainly had no context in which to consider that situation. The Wilson decision, the Wilson challenge, was filed the day after Proposition 209 was passed. The Grutter decision tells us that in looking at these types of, quote, unquote, race-conscious programs, context matters. Wilson had no context because it was filed, because the challenge was filed the day after the proposition was passed. So we think, as counsel has already said, that the Wilson decision can be distinguished because this is a very specific context. If the plaintiffs are allowed to go forward with their case, they may or may not, that is still a possibility as well, but they may be able to prove the allegations in their complaint that, A, race-conscious admissions programs are the only way to address the imbalance in UC admissions that has resulted since Proposition 209. They may be able to prove that there is systemic racial inequalities in the educational process and in the testing process. And Wilson, and that would create a factual context that just simply was not considered by the Wilson court because there was no way it could have been. It didn't exist at that point. So we, for all those reasons, we believe that Wilson is not controlling here. And if Wilson is not controlling here, then there are a host of reasons why Proposition 209 does, in fact, violate the Equal Protection Clause, as were addressed in our briefs even in the dissent from the denial of rehearing in the Wilson decision. Proposition 209, as I said, creates an unequal political structure. And, unfortunately, I see my time is about to be up, so I will leave the rest to my colleagues. Thank you. Thank you, Ms. Cordero. Thank you very much. Thank you. May it please the Court. Brad Phillips on behalf of Mark Udoff, the President of the University of California. Plaintiffs do not allege here either that UC's current admission policies are unconstitutional or that a judgment invalidating Proposition 209 would require the university to do anything differently. They allege only that Proposition 209 strips the university of the discretion to adopt affirmative action policies if it chooses to do so. The Supreme Court, in other cases that they cite with respect to suing a state official, are cases in which a judgment against that official would, in fact, have required the official to act differently than he was alleged to have done. That is not the case here. Under both Ex parte Young and this Court's decision in SNAP v. Brusso, a state official must have a, quote, fairly direct connection to enforcement of the law. Suppose it came to Udoff's attention that somebody in the admission office was not following Prop 209. What would he be obligated to do? Your Honor, I believe he would have an obligation to ensure that Proposition 209 was being implemented within the university. But that is a matter of implementation. The university is a single entity. The university is a single entity, just like a school district, for example. And the question of whether a state official has enforcement authority is a question of whether they have the right to compel others and other entities to comply with the law, not a question of whether or not, for example, a principal in a school or a school district superintendent has an obligation to ensure that the law is being implemented by those under his or her supervision. If that were not the case, Your Honor, every single school administrator in the State of California would be subject to suit to invalidate Prop 209 as applied to their particular institution. And we don't think that's what Ex parte Young. They're not being sued. I don't know what would happen if they sued somebody else. I don't – what's your authority for the proposition that there's a difference between implementation and enforcement? Well, Your Honor, I think Snook v. Broussa in itself is pretty clear on that point because the commissioners in Snook v. Broussa were implementing the law. They were, of course, also enforcing the law in the sense that they were requiring their – Well, the Supreme Court of Nevada was enforcing the law, wasn't it? That's the point, Your Honor, I think that I'm making is I think the Supreme Court was enforcing the law because the Supreme – I mean, the commission had nothing to do with enforcing anybody to do anything. They did, Your Honor. The commission first would have required their subordinates to comply with the law and would have required those applying to register to comply with the law, but – You can make the same distinction between your client and the Regents as a body, can't you, as between the commission and the Supreme Court? Well, I don't think so, Your Honor. I think the Regents, like the President – of course, the Regents is not subject to suit here, but the Regents, like the President, is implementing the law within the University of California as an entity. Neither the Regents nor the President have the ability to penalize anyone in the sense that enforcement means in this context. And I do think that SNCC really does foreclose the notion that simply requiring that your subordinates comply with a law is not the kind of enforcement authority that's relevant for Eleventh Amendment purposes. And if that were not the case, as I suggest, I really – it is, I think, the case that anyone, any official who has subordinates and is required to comply – Well, with respect to the educational policies that plaintiffs are complaining about, who is then that authority? The authorities who have the power to enforce Proposition 209 are the Governor and the Attorney General expressly. As against the university? Yes, Your Honor. I believe that's the case. And, in fact, the Governor and the Attorney General in the past have taken enforcement action against school officials in California, university and other school officials in California to enforce Proposition 209. Private parties have the power under Prop 209 to bring lawsuits to enforce it against the university and schools, other schools, and have done so. But if President Yudof is subject to suit under the ex parte Young line, then anyone who is implementing a law and who has subordinates who he would be required to ensure are also implementing the law would be subject to suit. And we think, A, Snook v. Bruce Snook forecloses that argument, and, B, it doesn't make sense under the Eleventh Amendment, because otherwise you just wouldn't – it's not a question of their enforcing it against someone else. It's simply a question of their implementing the law. And this case is, in fact, like Snook and not like the Yu case here, Your Honor. In addition, Your Honors, the university is – President Yudof is not a proper party under Rule 21, because a judgment in this case would – he is neither necessary nor sufficient for a judgment in this case to grant the plaintiffs the relief that they seek. A judgment against President Yudof saying that Proposition 209 was invalid would not relieve him of the obligation to comply with Proposition 209, because the governor, the attorney general, and private parties would not be bound by that against him in state court. A judgment against President Yudof would not require the university to do anything whatsoever differently than they are currently doing. There is no allegation that the university's current policies are illegal or unconstitutional in any way. It would simply, if it were enforceable against others, at the most it could do would free the university to choose to use affirmative action, if it chose to do so. Plaintiffs have raised the specter that third parties might sue the university to enforce Proposition 209 as a reason to have President Yudof in this case somehow. But the fact that third parties might sue the president or the university to enforce Proposition 209 is irrelevant, because, again, a judgment against the president in this case would not bar those other suits. The only way in which suits against the president and the university would be barred would be if all of those potential parties were parties to this case, which of course they're not, or ultimately if the Supreme Court of the United States were to decide that Proposition 209 were unconstitutional. In that event, of course, the state courts would be obliged to follow that ruling as well. But a judgment against the president in this case would neither require him to do anything differently, and it would not afford the plaintiffs any of the relief that they seek. And so he is not a proper party. Your Honor, I'd like to emphasize what the Supreme Court said in Shaw v. Reno, which I think is particularly applicable here with respect to President Yudof. And they said in that case that in the context of a Fourteenth Amendment challenge, the courts must bear in mind the difference between what the law permits and what it requires here, because invalidation of Proposition 209 would at most permit the university to consider affirmative action policies with no obligation to do so and no obligation to implement such policies, but would not require that it do anything differently. President Yudof is not a proper party in this case under Rule 21, even if he were a proper party, which we submit that he is not under the Eleventh Amendment. Well, then let me ask a hypothetical question. It seems to be, you know, Mr. Washington's argument in part as to the wrongness of Wilson is that certain changes in policy are required by the Fourteenth Amendment. I don't think so. Just hypothetically, if that were his argument, you agree then you're a proper party? Your Honor, if there were allegations in the case that policies of the University of California were current policies, were unconstitutional, then I think the President would potentially be a proper party. There are no such allegations. They do not allege a history of past discrimination at the university that would justify a compelling affirmative action, and they do not allege that any of the university's other policies are in fact unconstitutional under the Equal Protection Clause or any other. What they are saying is that because Proposition 209 ties the university's hands, it's not able to do some things that might be beneficial to their clients. But the university is not in a position, even with a judgment of this Court, to untie its own hands. Only a judgment against the Governor, the Attorney General, and potentially with respect to private parties, the decision of the Supreme Court of the United States, would truly untie the university's hands. But it can't be done in a lawsuit against President Yudof. And if I may, I'd like to reserve one minute of potential rebuttal time and turn it over to Mr. Kuczarski. Thank you. Good morning. Good morning. May it please the Court, Ralph Casarda for Defendant Intervenors Appellees. Your Honor, there is one thing I would like to stress this morning, and that is that Proposition 209, which is Article I, Section 31 of the California Constitution, prohibits the State and all its instruments from discriminating on the basis of race and gender. It also prohibits the State from implementing policies that would restrain or discriminate against students seeking admission to the University of California. If the plaintiffs are alleging that the UC is discriminating on the basis of race, that is in itself a violation of Section 31. There is simply no need to enjoin Section 31 to allow plaintiffs to seek the relief that they request. If there are, in fact, allegations of discrimination against the UC. Nothing in Section 31 prohibits that. Is that the way you read the complaint, that there are such allegations? Well, I'm having — I had a difficult time reading the complaint, Your Honor. But the complaint, as I understand it, alleges that there is discrimination and that the discrimination is a result of Section 31. However, Section 31 is constitutional in all respects. Therefore, if — and it commands the University of California to eradicate discrimination and to treat plaintiffs — to treat all prospective students equally. The Section 31 is no barrier to plaintiffs petitioning the Regents for admission policies that enhance the opportunities of students who have suffered adverse conditions from social economic conditions, educational inequality at K through 12, as long as those policies are available to all students who have suffered those adverse conditions. So Section 31 is constitutional and it provides the very relief which plaintiffs will — Counsel, in the context of this case and the plaintiffs' allegations, it would appear that in part they're saying that specifically as to the University of California, the absence of affirmative action is itself discriminatory, which would be one of the thrusts of their argument. Yes, Your Honor. And that argument was foreclosed by the Wilson Court, which held that impediments to any type of race-based affirmative action is not a violation of the Constitution. And therefore, that allegation does not allege a constitutional injury, according to the court in Wilson. And I think Wilson is controlling in this case. Obviously, Wilson held that Section 31 is constitutional under conventional equal protection and under the political restructuring equal protection analysis. And there are claims that Grutter is somehow inconsistent or the standard would be it is clearly irreconcilable with Wilson, and I think that's not the case for two very important reasons. One is that Grutter was cast in terms of what the Constitution barely tolerates, not what it requires. And second, while Grutter was discussing that the University of Michigan Law School could assert a compelling interest in diversity, it also gave a positive reference to California and to Section 31 by reminding the nation that states need not implement race-conscious affirmative action. So Grutter would not have meant to imply that a state must invoke a compelling interest in racial diversity if at the same time it was reminding the nation that there are states that, in fact, prohibit such race-conscious admissions policies. And that is also consistent with the Bakke case. In Bakke, in the dissent, Justice Brennan admitted, conceded that a state could refrain from giving any type of race-conscious admission policy. And in the Seattle case, Justice Powell, in his dissent, commented his concern, about his concern, that under the majority's opinion, a university could never repeal any type of anti-discrimination policy. In fact, he specifically mentioned race-conscious admissions policy. The majority in Seattle responded that that was not the case, that a state could, in fact, remove decision-making over all racial matters to the state, or it could remove racial matters in a race-neutral manner. Section 31 prohibits discrimination on the basis of race and preferred entry into public education, contracting, and employment. It is a race-neutral measure, and it satisfies the Seattle case. There was one additional point I would like to mention, and that is whether Wilson considered Section 31 as it was applied to the University of Admissions. And a reading of the district court decision in Wilson confirmed that, the district court made very specific findings about how Section 31 impacts, would impact the admissions at the UC. The Wilson court mentioned that, and the Wilson court specifically decided to, specifically accepted all of those findings as true. And yet, it still concluded that Section 31 was constitutional in all regards. My only point that I was hoping to stress this morning, Your Honor, is that Section 31 of the Constitution is no barrier to plaintiffs to petition the University of California to have it change or adopt any admission policy which does not discriminate on the basis of race. Section 31 does not require the University of California to have any specific type of admissions test. And Section 31 is no barrier to plaintiffs petitioning the University of California for admission policies that take into account the adverse conditions which these plaintiffs have suffered as long as the policies are available to all students without regard to race. In that regard, Section 31 is constitutional, it is race neutral, and there is no need to enjoin it. In addition, if a district court were to conclude that there was discrimination of such extent as to justify a race-conscious relief, that is also consistent with Section 31 because Section 31 has a savings clause. Courts have noted that read in its entirety, Section 31 only affects race-conscious measures not required by the Constitution. It does not – it is clearly consistent and it does not bar any race-conscious relief required by Federal law or by the Constitution. If there's no more – if there are any questions on that. I don't think so. Thank you, Sarada. Thank you. Rebuttal. I'm sure we have the right time on here, isn't it? Fifteen minutes is what's shown on the calendar. Pardon me? How much time were you expecting? Five minutes. Thank you. Thank you. There we go. Good morning. Good morning. I want to start by saying that affirmative action programs were created in the mid-1960s when the Civil Rights Movement came to the North. And they were created because at that point in time, in 1965, if you looked at the University of California, Berkeley, UCLA, the University of Michigan, and NYU student bodies, all those four northern institutions, you looked at their law school, you would have found that they had less black students than the University of Mississippi. It took conscious measures to create opportunities for Latino and black people to become lawyers and doctors in any kind of proportion in this society. What Proposition 209 did was it established a system in which the resegregation of higher education could go forward in a state in which the majority of people are going to be minorities. Today, if you looked at the business school at UCLA, one black student. If you looked at the law school at UC Davis, three Latino students and two black students and an entering class of 200 students. I do not believe that that is what Wilson anticipated. I do think that it is possible for you to do one of three things. First, to accept our arguments that Wilson did not consider the factual basis that we can present in this case that makes it possible to grant the students their day in court. And with that, I'd just like to say this. The term preference is so vague, and what it means in the context of higher education, even defining that term was something that the Wilson court never took upon itself to do. The presumption that Latino and black students were receiving an advantage over and against white students was a false premise, and it's a premise that is being continued so long as there isn't an opportunity to determine whether affirmative action programs are a means to level the playing field or whether they are something that provides an advantage to underrepresented minority students. The second thing that we are saying to you, to this court, is that it's possible to find that the Section 31 is impermissible using a conventional equal protection analysis. The third thing that we're saying to this court is that what is so important in this case to us, and Judge Silverman, you asked, what is it can we do? We're asking that you give the students in this case their day in court, because not to do that, not to do that in this case means, as was true underground, that a badge of inferiority is affixed to those students, and not to give us our day in court provides the, it furthers the possibility that California will become a state commanded by an apartheid system rather than a system that anyone thinks legitimately expresses fairness, equality, and avoids the problems of discrimination. Counsel, let me take us back to civil procedure, though. You talk about a day in court, and nobody wants to deny anybody a day in court, but as I like to say as a district judge when I'm talking about a motion to dismiss to the plaintiff, you are queen for a day, and that is we must assume that everything that you allege is true. I don't, how would we advance the ball procedurally by saying you have your day in court to prove what you've alleged when we must today assume that what you allege has been fully proven? Yeah. I mean, I think the question is, is where do things go from here? And the attorney general in the governor's office has asked that you simply make no decision and recommend that this case go to an en banc panel. We think that somebody, somebody has the obligation to tell the truth or to make it possible for the truth to come out and to take responsibility to prevent what is occurring now, which is the creation of a new Jim Crow in the state of California. And if not the three of you, then who? Then who? The governor says, oh, I'm the wrong party. The President Yudof says, I'm the wrong party. No one is standing up and trying to address the substantive matters at hand. We ask that you do it. You mentioned parties. The governor, I guess, originally claimed in the case that he was the wrong party. He no longer takes, or this governor doesn't take that position. Does it make any difference one way or the other whether Yudof is in or out? I think it makes a difference because I think to contend that you have no enforcement responsibility when I think President Yudof would insist that an admission system at one of the universities of California be changed if all of a sudden there was a huge number of Latino and black students that were admitted. Hypothetically, if we said Yudof should have been dismissed, your case goes on, right? I mean, it doesn't really change anything, does it? Our case goes on. That's right. No, it goes on. It does go on. Yeah. Yeah. So my question is, does it make any difference as a practical matter whether we keep Yudof in or keep Yudof or kick him out? I don't think it does as a practical matter, but I do think it does as a real matter. And that's what we're trying to get to. I don't catch that distinction. Okay. There is a reality. There is a reality of the ways in which Section 31 are structuring educational opportunity so as to deny the majority of high school graduates in this state any access to their flagship schools. But you can get that point vindicated by going forward against the governor, right? We can. Okay. I see you're out of time. Thank you, Mr. Chief Justice. Thank you. We had some rebuttal reserved? Okay. Thank you very much. The case just argued and ably so is submitted. We'll stand and recess on this case.
judges: Garbis, Tashima, Silverman